IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| FRANCES TERESA MORELAND, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. CIV-13-639-L |
| CAROLYN W. COLVIN, acting Commissioner Social Security Administration, | ) ) ) ) ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Frances Moreland (Plaintiff) invokes this Court's jurisdiction to obtain judicial review of the Defendant Acting Commissioner's (Commissioner) final decision denying Plaintiff's application for disability insurance benefits under the Social Security Act. *See* 42 U.S.C. § 405(g). United States District Judge Tim Leonard has referred the matter to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (b)(3) and Fed. R. Civ. P. 72(b). After carefully reviewing the pleadings, the administrative record (AR), and the parties' briefs, the undersigned recommends the Commissioner's decision be affirmed.

I. **Administrative proceedings.**

Plaintiff, at the age of sixty-one, protectively filed her application for disability benefits with the Social Security Administration (SSA) in January

2009, claiming she became unable to work on October 31, 2008 as a result of a disabling condition. AR 121-24, 135.[1] The SSA denied the application at the State agency level, and Plaintiff challenged that determination by requesting a hearing before an administrative law judge (ALJ). *Id.* at 78. Both Plaintiff and a vocational expert appeared and testified at the September 2010 hearing. *Id.* at 38-62.

In her July 2012 written hearing decision, *id.* at 22-33, the ALJ determined that Plaintiff was severely impaired by hypertension, obesity, a history of hernias, lumbar and cervical pain, and bilateral tricompartmental osteoarthritic changes in her knees (left more than right), but found none of these impairments, alone or in combination, presumptively disabling. *Id.* at 25-27. The ALJ reviewed the medical evidence, evaluated the opinion evidence, and assessed the credibility of Plaintiff's subjective complaints before concluding that Plaintiff had the residual functional capacity (RFC)[2] to perform a wide range of

---

[1] Plaintiff testified at her administrative hearing that she "started drawing my partial Social Security" when she "turned 62." AR 45.

[2] Residual functional capacity "is the most [a claimant] can still do despite [a claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

light work. *Id.* at 27-32.[3]

The ALJ ultimately found that because Plaintiff's past relevant work as a telemarketer and appointment clerk did not require her to perform any work-related activity precluded by her RFC, she had not been under a disability at any time from October 31, 2008, her alleged onset of disability date, through the date of the hearing decision. *Id.* at 32.

The ALJ's decision became the Commissioner's final decision when the SSA Appeals Council denied Plaintiff's request for review. *Id.* at 1-6; 20 C.F.R. § 404.981; *Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009). Plaintiff then commenced a timely civil action in this Court to obtain judicial review of that final decision. Doc. 1, at 1; Doc. 11, at 1; 42 U.S.C. § 405(g).

## II. Determination of disability.

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable

---

[3] By agency regulation,

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls.

20 C.F.R. § 404.1567(b).

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(b)-(f); *see also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing five steps). Under this sequential procedure, Plaintiff bears the initial burden of proving she has one or more severe impairments. *See* 20 C.F.R. § 404.1512; *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). Then, if Plaintiff shows she can no longer engage in prior work activity, the burden of proof shifts to the Commissioner to show Plaintiff retains the capacity to perform a different type of work and that such a specific type of job exists in the national economy. *See Turner*, 754 F.2d at 328; *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).

### III. Analysis.

#### A. Standard of review.

This Court reviews the Commissioner's final "decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). "A decision is not based on substantial

4

evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988) (citation omitted).

### B. Plaintiff's claims of error.

Plaintiff raises two claims of error: (1) "[t]he ALJ erred when she rejected the Claimant's Treating Source Statement . . . and when she failed to properly evaluate the Treating Source Statement using the six factors required by 20 C.F.R. 404 section 151 and Robinson v. Barnhart, No. 03-2170 (10th Cir. 2004)" and (2) "[t]he ALJ erred when she disregarded the testimony of the Vocational expert." Doc. 14, at 3.

#### 1. Whether the ALJ erred in considering the July 2010 opinion of Plaintiff's treating physician.

##### a. The opinion.

Allen Hamaker, M.D., completed a Physical Medical Source Statement on Plaintiff's behalf in July 2010. AR 270-73. He advised that he was Plaintiff's primary care physician and had been so since June 23, 2008. *Id.* at 270. He diagnosed lumbago,[4] Degenerative Disc Disease, and hypertension. *Id.* He used the term "stable" to describe Plaintiff's prognosis. *Id.* Dr. Hamaker listed Plaintiff's symptoms as "severe pain with standing, walking or sitting." *Id.*

---

[4] Lumbago is "a nonmedical term for any pain in the lower back." Dorland's Illustrated Medical Dictionary, 1076 (32d ed. 2012).

5

When asked to "characterize the nature, location, frequency, precipitating factors, and severity of your patient's pain," he wrote, "Low back radiating into legs. After 20 minutes she has to lie down to get relief." *Id.* He "identif[ied] the clinical findings and objective signs" as "x-rays of low back support diagnosis" and "[g]ait abnormal." *Id.* In "[d]escribing the treatment and response including any side effects of medication that may have implications for working, e.g., drowsiness, dizziness, nausea, etc.," he stated "Tylenol/Lortab." *Id.* Dr. Hamaker opined that Plaintiff's impairments had or would last for at least twelve months. *Id.*

Dr. Hamaker noted Plaintiff has "anxiety/depression" but opined that emotional factors did not contribute to the severity of her symptoms and functional limitations and that she was able to tolerate minimal stress. *Id.* He then identified depression and anxiety as "psychological conditions affecting [Plaintiff's] physical condition." *Id.* at 271.

Dr. Hamaker provided estimates of Plaintiff's functional limitations if "placed in a *competitive work situation.*" *Id.* She could walk half a city block without rest or severe pain; sit for more than two hours "*at one time . . .* before needing to get up;" stand for twenty minutes "*at one time . . .* before needing to sit down, walk around;" and sit for about four hours and stand/walk for less than two hours "*total in an 8-hour working day* (with normal breaks)." *Id.* Plaintiff

6

would need a job allowing her to shift, at will, "from sitting, standing, or walking every 30 - 40 minutes." *Id.* In the course of an eight-hour day, she needed to walk around every thirty to forty-five minutes for at least fifteen minutes each time. *Id.* Due to her "[p]ain, paresthesias, numbness," Plaintiff would sometimes need to take unscheduled, fifteen minute breaks every two to three hours during a working day. *Id.* With prolonged sitting and because of edema, Plaintiff's leg(s) should be elevated, to "heart level if possible." *Id.* at 272. Assuming sedentary work, her leg(s) should be elevated for twenty-five percent of an eight-hour day. *Id.*

Dr. Hamaker indicated Plaintiff did not need a hand-held assistive device for occasional standing/walking. *Id.* He opined that she can never lift and carry anything of any weight while working. *Id.*[5] She can never crouch, squat, or climb stairs and ladders. *Id.* She can rarely twist. *Id.* She can both never and rarely stoop. *Id.* Dr. Hamaker noted no significant reaching, handling, or

---

[5] Dr. Hamaker checked the boxes on the form indicating Plaintiff can "never" lift and carry ten pounds or greater in a competitive work situation. AR 272. There is not a similar box for "[l]ess than 10 lbs." *Id.* Nonetheless, he failed to check any of the available boxes indicating Plaintiff was able to lift and carry less than ten pounds either "rarely," "occasionally," or "frequently." *Id.*

The Commissioner argued that Dr. Hamaker "indicated that Plaintiff could 'never' lift any amount[.]" Doc. 15, at 4. Plaintiff, who testified that "I can lift a gallon of milk, but I can't lift anything over 50 pounds because I've had hernias," did not challenge the Commissioner's characterization of Dr. Hamaker's opinion in her reply brief. AR 53; Doc. 16.

7

fingering limitations. *Id.*

He estimated that Plaintiff would not need to miss work if these restrictions were followed, and he affirmed that her impairments were "*reasonably consistent* with the symptoms and functional limitations [as] described . . . ." *Id.* at 273.

        **b.     Arguments.**

Plaintiff contends the ALJ "effectively reject[ed]" Dr. Hamaker's treating source opinion. Doc. 14, at 9, *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating an ALJ's decision to "accord[] little weight" to an examining physician's opinion with a rejection of the opinion). The Commissioner concedes this characterization, and correctly so. Doc. 15. In sharp contrast to Dr. Hamaker's appraisal of Plaintiff's functional limitations – no lifting/carrying; no more than four hours of sitting; less than two hours of walking/standing with only twenty minutes of standing at a time; no climbing; no and rare stooping; no crouching, AR 271-72 – the ALJ found Plaintiff capable of lifting/carrying twenty pounds occasionally and ten pounds frequently; walking/standing for four hours in a workday; sitting indefinitely (with normal breaks); and climbing, kneeling, stooping, crouching, and crawling occasionally. *Id.* at 27. According to Plaintiff, the ALJ also rejected Dr. Hamaker's opinion that she "suffered from hypertension, degenerative disc disease, edema, [and] lower back pain that

8

radiates into her legs . . . ." Doc. 14, at 11.

### c. Applicable law.

An ALJ must give a treating physician's medical opinion "controlling weight" if it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques'" and is not "'inconsistent with the other substantial evidence in the case record.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir.2003) (quoting SSR 96-2p, 1996 WL 374188, at *2). Even if the ALJ determines at this first step of the two-stage inquiry that a treating physician's medical opinion is not entitled to "controlling weight, it is still entitled to deference; at the second step of the analysis, the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the [applicable] regulations for this purpose, for the weight assigned." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). These factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331. "[T]he ALJ's findings must be sufficiently specific to make clear to

9

any subsequent reviewers the weight [s]he gave to the treating source's medical opinion and the reason for that weight." *Id.* (alteration and internal quotation marks omitted). Nonetheless, the ALJ need not "apply expressly" every factor because "not every factor for weighing opinion evidence will apply in every case." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (alteration omitted). "Finally, if the ALJ rejects the opinion completely, [s]he must then give specific, legitimate reasons for doing so." *Watkins*, 350 F.3d at 1301 (internal quotation marks omitted).

### d.     The ALJ properly considered Hamaker's opinion.

The ALJ set out a detailed chronological summary of the medical evidence of record for the time period informing Dr. Hamaker's July 2010 medical source opinion. AR 28-32. She considered the findings made by Dr. Hamaker and by other physicians during that time period as well as the results of any testing. *Id.*

She found that Plaintiff presented to Dr. Hamaker in August 2008 for a follow-up evaluation of her hypertension. *Id.* at 28, 229-30.[6] On physical examination of Plaintiff's extremities, Dr. Hamaker noted that the "[r]ight ankle and left ankle shows evidence of edema + 1." *Id.* at 229. His impression was

---

[6]    This report follows Plaintiff's focus on her physical limitations. *See* Doc. 14.

"[b]enign essential hypertension uncontrolled" and "[e]dema bilateral." *Id.* at 229, 28.

Several months later, on indications of edema and shortness of breath, Dr. Hamaker ordered testing on Plaintiff's right and left lower leg. *Id.* at 28, 215. The examining physician, Dr. Marshall, reported that Plaintiff's veins and flow were normal and that there was "no deep venous thrombosis." *Id.* The record contains a copy of Dr. Marshall's report with an October 15, 2008 note initialed by Dr. Hamaker instructing, "Tell patient no blood clots seen." *Id.* at 237.

In January 2009, Plaintiff complained about a bloody cough during a follow-up evaluation of her hypertension. *Id.* at 28, 214, 223-24. On examination, Dr. Hamaker noted "evidence of edema +1." *Id.* at 224. He diagnosed "[b]enign essential hypertension uncontrolled. This is due to noncompliance with her" medication. *Id.* He also diagnosed "[a]cute bronchitis. Improving. She did complain of hemoptysis so will get CXR*." Id.* The chest x-ray taken several days later showed the "soft tissues and bony thorax to be unremarkable except for degenerative changes of the spine. The lungs are well expanded and clear." *Id.* at 28, 214. Dr. Marshall, once again the examining physician, found "[n]o active or acute disease." *Id.*

Plaintiff returned in February 2009 for an evaluation of her hypertension. *Id.* at 28, 221-22. Dr. Hamaker found "[n]o edema present bilateral lower

11

extremities. Ankles puffy and legs are very large as are her arms due to obesity." *Id.* at 222, 28-29. His impression was "[b]enign essential hypertension uncontrolled" and "[b]ilateral edema. I don't see much today." *Id.* at 222, 28.

Dr. Hamaker checked Plaintiff's blood pressure in early May 2009. *Id.* at 29, 219. He diagnosed hypertension, controlled. *Id.* Later that month, Jim L. Burke, D.O., examined Plaintiff at the SSA's request. *Id.* at 29, 239-245. Plaintiff complained that "[s]he can no longer sit for any length of time due to blood clots and chronic pain in her lower legs" and that "[s]he gets leg cramps when she sits for any length of time or walks for any significant distance." *Id.* at 239, 29. She advised Dr. Burke that "[s]he can no longer lift or carry due to the hernias she's had in the past." *Id.* at 239.

Dr. Burke reported that his

[f]ocus exam of the upper extremities reveals normal ROM of the shoulders, elbows, wrists and hands as noted on the ROM flow sheet. There is no evidence of wrist crepitus noted. There is no evidence of muscular atrophy or hypertrophy. There is no evidence of interosseous atrophy or digital nodularity noted. Pt has a negative Tinel's and Phalen's sign bilaterally. Grip strength is 5/5 and symmetrical bilaterally. Radial pulses are satisfactory bilaterally.

*Id.* at 240, 29. His

[f]ocus exam of the lower extremities reveals normal ROM of the hips, knees, and ankles as noted on the ROM flow sheet. There is no evidence of dependent edema or varicosities noted. There is no evidence of knee crepitus or effusion. Popliteal spaces are free of any

12

evidence of masses. Pedal pulses are rated 2+ bilaterally.

*Id.* Dr. Burke's musculoskeletal examination showed normal posture, normal range of motion of the axial spine, and a negative straight-leg raising test bilaterally in both the seated and the supine positions. *Id.* at 241, 29. He found that Plaintiff "ambulates with a safe and stable gait at an appropriate speed without the use of any assistive devices." *Id.*

Dr. Burke diagnosed hypertension, chronic leg pain and blood clots, gout, depression, and chronic back pain. *Id.* But he specified, as did the ALJ, that he diagnosed each of these impairments *by history*. *Id.*

Plaintiff returned to Dr. Hamaker in May 2010 for a follow-up hypertension evaluation and "for initial evaluation of low back pain." *Id.* at 29, 285-87.[7] Dr. Hamaker noted a three-week duration of the condition. *Id.* at 285. Plaintiff reported that she had slipped on ice about four years ago and injured her back; had fallen at home about three years ago; had fallen in Missouri two years ago and injured her back; and had a neck injury from her ex-husband. *Id.* at 30, 285. She told Dr. Hamaker that the pain was located in her lower back; it was worse when she leaned over; walking occasionally caused it; and getting out of a bed and a chair caused it to hurt a little. *Id.* Dr. Hamaker noted her

---

[7] Dr. Hamaker's May 13, 2010 report is also found at AR 276-78, 279-80, 288-89.

13

report of "some radicular symptoms in her right lateral thigh" and, on examination, conducted bilateral straight-leg raise testing. *Id.* at 285, 286, 29. The results were negative. *Id.* at 286, 29. He detected moderate paravertebral lumbar tenderness and evidence of edema on examination. *Id.* He diagnosed controlled hypertension and low back pain. *Id.*

Some eight weeks later, Dr. Hamaker completed the medical source statement that the ALJ later rejected. *Id.* at 270-73.

Plaintiff theorizes that "[t]he only discernible reason the ALJ gave for rejecting the treating source statement seemed to be based on pure speculation on the part of the ALJ." Doc. 14, at 9. She points to the ALJ's statement that Dr. Hamaker "appears to be more interested in [Plaintiff's] economic security than in making limitation for her as an objective care provider." *Id.*; AR 32.

The undersigned agrees with Plaintiff on one point – the ALJ *did* speculate. But the ALJ did not base her rejection of the doctor's functional restrictions on her guess about his motivations. Instead, at the first step of her analysis, she examined and summarized the evidence of record, showing both the lack of clinical support for the significant functional restrictions imposed by Dr. Hamaker and their inconsistency with other record evidence. AR 28-32.

For example, in his medical source statement, Dr. Hamaker diagnosed Plaintiff with "lumbago" and degenerative disc disease, stating that the

14

impairment(s) caused her severe pain when she stood, walked, or sat, and characterizing the pain as being in her "low back *radiating* into [her] legs." *Id.* at 270 (emphasis added). He imposed his standing, walking, and sitting limitations as a result. *Id.* at 271. But as the ALJ observed, when Dr. Hamaker last examined Plaintiff before completing his opinion statement, the straight-leg raising test was negative. *Id.* at 29. The doctor's only objective finding at that examination – the examination when Plaintiff first reported back pain – was "moderate paravertebral lumbar tenderness" and his diagnosis was "low back pain," not degenerative disc disease. *Id.* at 29, 286. He noted Plaintiff's report of radicular symptoms and indicated that he would "check xrays of low back." *Id.* at 286-87. He then identified "x-rays of *low* back" as the first of his two "clinical findings and objective signs" in his medical source statement. *Id.* at 270 (emphasis added). But the ALJ found evidence only of a chest x-ray, an x-ray that would necessarily show the thoracic, not the lumbar spine. *Id.* at 28. She also noted that "no studies of the back or neck [were] presented as evidence" to support Plaintiff's claimed history of falls and injuries. *Id.* at 30.

Dr. Hamaker listed an abnormal gait as his only other "clinical finding[] and objective sign[]." *Id.* at 270. Based on the ALJ's examination (verified by the undersigned's review) of Dr. Hamaker's pre-opinion treatment records, he had not previously documented such an abnormality. *Id.* at 28-30.

15

Similarly, the ALJ's summary of Dr. Hamaker's treatment notes reveals that his findings with regard to Plaintiff's edema were generally consistent and failed to reflect a basis for the doctor to abruptly require that Plaintiff elevate her legs to heart level for twenty-five percent of an eight-hour day. *Id.* at 28-30, 272. The undersigned's review of the evidence bears this out. Dr. Hamaker had never advised Plaintiff to elevate her legs to *any* level, regardless of her work status. The same holds true with respect to Dr. Hamaker's finding that Plaintiff was unable to lift and carry *anything* when working. *Id.* at 28-30.

The ALJ then concluded that Plaintiff's claims of falls and injuries were incredible, a finding that Plaintiff does not challenge on judicial review. *Id.* at 30; Docs. 14, 16.[8] And, having found no support from Dr. Hamaker's own findings on examination (or from any other evidence of record) for the treating doctor's assessed functional limitations, the ALJ reasonably concluded that Plaintiff's incredible claims informed that assessment and so, at the second step of the treating physician analysis, she rejected it, declining to give it the deference a treating physician's opinion might otherwise receive. AR 32.[9]

---

[8] The ALJ found, in part, that Plaintiff did not report a history of falls and injuries to Dr. Hamaker until just before asking him to complete a medical source statement on her behalf. AR 30.

[9] The ALJ's decision demonstrates her consideration of the fact that Dr. Hamaker was Plaintiff's treating physician, AR 30, and her understanding of
(continued...)

Plaintiff has failed to demonstrate that the ALJ erred in her disposition of Dr. Hamaker's treating physician opinions.

### 2. Whether the ALJ erred by disregarding the testimony of the vocational expert.

Here, Plaintiff challenges the ALJ's finding that she retains the ability to perform her past relevant work as a telemarketer and appointment clerk. Doc. 14, at 13. She claims "the ALJ fail[ed] to account for the [vocational expert's] testimony that an individual with [Plaintiff's RFC], who would have to elevate her legs at heart level whenever seated, would not be able to perform any job in the regional or national economy." *Id.*

Plaintiff is referring to the vocational expert's testimony in response to a hypothetical question posed by her representative at the administrative hearing. AR 60-61. The representative asked the vocational expert whether a hypothetical individual would be able to perform Plaintiff's past relevant work if – per Dr. Hamaker's (rejected) opinion – the individual would need to keep her legs elevated at heart level. *Id.* The vocational expert testified that such a limitation would preclude the performance of Plaintiff's past relevant work. *Id.*

---

⁹(...continued)
the length of that doctor-patient relationship; of how often Dr. Hamaker examined Plaintiff; of the scope of his examinations and testing; of how well his functional assessments were supported by the evidence; and of whether or not those functional assessments were consistent with his own findings and the findings of other physicians. *Id.* at 28-32; *see* 20 C.F.R. § 1527(d)(2)(i)(ii).

at 61. But the ALJ did not accept this limitation as true and did not include it in Plaintiff's RFC assessment. *Id.* at 27. "An ALJ is not bound by [vocational] testimony in response to a hypothetical that fails to set forth only those impairments the ALJ has accepted as true." *Ruth v. Astrue*, 369 F. App'x 929, 931 (10th Cir. 2010) (citing *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990)). Plaintiff's claim of error is unavailing.

## IV. Recommendation and notice of right to object.

For the reasons stated, the undersigned Magistrate Judge recommends the Commissioner's decision be affirmed.

The undersigned advises the parties of their right to object to this Report and Recommendation by September 3, 2014, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The undersigned further advises the parties that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation disposes of all issues referred to the Magistrate Judge in this matter.

ENTERED this 14th day of August, 2014.

_____
SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE